******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# ELIZABETH SPALTER IINO *v.* DIANE ROGERS SPALTER, EXECUTRIX (ESTATE OF HAROLD SPALTER)
## (AC 40574)

Elgo, Bright and Beach, Js.

*Syllabus*

The plaintiff sought to recover compensatory and punitive damages from the defendant executrix of the estate of the decedent for, inter alia, intentional sexual assault in connection with the decedent's sexual abuse of the plaintiff. The plaintiff alleged that her father, the decedent, had sexually abused her repeatedly in Connecticut from when she was six years old until she was seventeen, that she suffered extreme trauma, mental anguish and psychological injuries as a result of the decedent's sexual abuse and that her injuries were permanent. The defendant filed a motion to dismiss for lack of personal jurisdiction, which the trial court denied. Thereafter, the defendant filed a motion in limine to preclude evidence of other wrongs or acts of verbal and physical abuse committed by the decedent against the plaintiff, her brothers and the family dog. The court denied the motion in limine but stated that it was reserving judgment on specific objections to such evidence until the evidence was offered at trial. Following the trial, the jury found in favor of the plaintiff and returned a verdict awarding her $15 million in compensatory damages. The jury also found that the plaintiff was entitled to an award of punitive damages, but it was not asked to determine the amount of the punitive damages to be awarded. Thereafter, the trial court denied the defendant's motion to set aside the verdict and rendered judgment in accordance with the verdict, reserving to itself the finding as to the amount of the punitive damages award, which would be determined later. On the defendant's appeal to this court, *held*:

1. The trial court properly denied the defendant's motion to dismiss; contrary to the defendant's claim that that court's assertion of personal jurisdiction over her violated her right to due process because she personally had no minimum contacts with Connecticut, because the court could have exercised jurisdiction over the decedent pursuant to this state's long arm statute (§ 52-59b) for the tortious acts he committed while in this state, it properly exercised jurisdiction over the defendant, who, as executrix of the decedent's estate, had stepped into his shoes for purposes of this action.

2. The defendant could not prevail on her claim that the trial court improperly admitted certain evidence, as any purported error in the admission of the evidence was harmless:

a. The defendant's claim that the trial court erred in admitting evidence of other wrongs or acts of verbal and physical abuse committed by the decedent against the plaintiff, her brothers and the family dog was unavailing: the record revealed that when the court denied the defendant's motion in limine to preclude the subject evidence, it clearly stated that it was reserving judgment on specific objections to such evidence until it was offered at trial and that it would not recognize a standing objection to evidence on the issue, and, therefore, to preserve her objections, the defendant needed to object each time evidence was offered on the issue, which she failed to do; moreover, the testimony to which the defendant did object to at trial was merely cumulative of other similar testimony to which she did not object, and, therefore, even if this court assumed that the trial court's rulings were improper, the defendant failed to show that they likely affected the outcome of the trial.

b. The defendant's claim that the trial court improperly admitted certain photocopied excerpts from the plaintiff's 1997 journal, which was inadvertently discarded during the course of the litigation, under the state of mind exception to the hearsay rule set forth in the applicable provision (§ 8-3 [4]) of the Connecticut Code of Evidence was unavailing; even if the subject excerpts were admitted improperly, the evidence merely was cumulative of a considerable amount of other evidence, and, therefore, the defendant failed to prove that the claimed improper admission

of the excerpts likely affected the outcome of the trial.

3. The jury's determination that the plaintiff was entitled to common-law punitive damages was a final judgment for purposes of appeal because it did not constitute a supplemental postjudgment award, despite the fact that the trial court reserved the determination of the precise amount of those damages to a time postjudgment.

4. The trial court improperly permitted the jury to find the defendant liable for common-law punitive damages without evidence as to the plaintiff's litigation expenses and improperly reserved for its own consideration the specific amount of common-law punitive damages to be awarded; because the defendant properly and timely requested that the question of the amount of punitive damages be decided by the jury, she had the right to have the jury determine that issue, and because the plaintiff admittedly submitted no evidence of her litigation expenses, the matter should not have gone to the jury, as there was no evidence to support the plaintiff's claim for punitive damages.

5. The trial court did not abuse its discretion in denying the defendant's motion to set aside the verdict, in which she alleged that there was insufficient evidence that the plaintiff suffers from post-traumatic stress disorder and other psychological trauma and injuries; there was ample evidence that the plaintiff suffers from psychological trauma caused by the childhood sexual abuse of the decedent, as the plaintiff submitted factual evidence as to what the decedent did to her and the impact his actions have had on her emotional and psychological well-being, and she submitted expert testimony regarding the symptoms typically displayed by victims of sexual abuse, and it was within the province of the jury to conclude, on the basis of all of the evidence it heard, that the plaintiff's evidence regarding the emotional and psychological injuries inflicted on her by the decedent was credible and that her injuries were worthy of compensation.

Argued April 16—officially released September 10, 2019

*Procedural History*

Action to recover damages for, inter alia, intentional sexual assault, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk, where the court, *Lee, J.*, denied the defendant's motion to dismiss; thereafter, the court denied the defendant's motion to preclude certain evidence; subsequently, the matter was tried to the jury; verdict for the plaintiff; thereafter, the court denied the defendant's motion to set aside the verdict and rendered judgment in accordance with the verdict, from which the defendant appealed to this court. *Reversed in part*; *judgment directed in part*.

*Alexander Copp*, with whom were *David B. Zabel* and, on the brief, *Barbara M. Schellenberg*, for the appellant (defendant).

*Hugh D. Hughes*, for the appellee (plaintiff).

*Opinion*

BRIGHT, J. The defendant, Dianne Rogers Spalter, executrix of the estate of Harold Spalter, appeals from the judgment of the trial court, rendered after a jury trial, in favor of the plaintiff, Elizabeth Spalter Iino, the biological daughter of Harold Spalter, the decedent (decedent). On appeal, the defendant claims that the trial court improperly (1) denied her motion to dismiss for lack of personal jurisdiction, (2) admitted certain evidence, (3) permitted the jury to find her liable for punitive damages without evidence as to the plaintiff's litigation expenses and reserved to itself the issue of the amount of punitive damages to be awarded, and (4) denied her motion to set aside the verdict, which alleged that there was insufficient evidence that the plaintiff suffers from psychological trauma caused by childhood sexual abuse. We agree with the defendant's third claim. Accordingly, we affirm in part and reverse in part the judgment of the trial court.

The following procedural history provides a sufficient foundation for our analysis. Following the death of the decedent, the plaintiff brought a two count complaint against the defendant executrix of the decedent's New York estate, alleging that the decedent repeatedly had sexually abused her in Connecticut from the time she was six years old until she reached the age of seventeen. She claimed extreme trauma, mental anguish and psychological injuries, and that such injuries were permanent. The first count of her complaint alleged intentional sexual abuse, and the second count alleged reckless sexual abuse. The plaintiff requested compensatory damages and punitive damages. Following a trial, the jury found in favor of the plaintiff on the first count of her complaint, and it returned a verdict awarding her $15 million in compensatory damages.[1] The jury also found that the plaintiff was entitled to an award of punitive damages, but it was not asked to determine the amount of the punitive damages to be awarded. The court rendered judgment in accordance with the jury's verdict, reserving to itself a finding as to the amount of punitive damages, to be determined later. The relevant facts and additional procedural history will be set forth as necessary throughout this opinion.

I

The defendant claims that the trial court improperly denied her motion to dismiss for lack of personal jurisdiction. She argues that the court's denial of her motion to dismiss was improper because "asserting jurisdiction over a New York executrix with absolutely no ties to Connecticut . . . violate[s] due process." She contends that, despite its agreement that the defendant "had no appreciable contacts in Connecticut . . . the trial court denied the motion to dismiss on the ground that [the decedent's] contacts with Connecticut were

sufficient to support jurisdiction. . . . The trial court erred by failing to base its decision on [the] defendant's complete lack of contacts with this state." We disagree.

The standard of review for a court's decision on a motion to dismiss is well settled. "A motion to dismiss tests, inter alia, whether, on the face of the record, the court is without jurisdiction. . . . [O]ur review of the court's ultimate legal conclusion and resulting [determination] of the motion to dismiss [is] de novo." (Internal quotation marks omitted.) *Cogswell* v. *American Transit Ins. Co.*, 282 Conn. 505, 516, 923 A.2d 638 (2007).

Although, "[a]s a general matter, the burden is placed on the defendant to disprove personal jurisdiction . . . [i]f the defendant challenging the court's personal jurisdiction is a foreign corporation or a nonresident individual, it is the plaintiff's burden to prove the court's jurisdiction." (Citations omitted; internal quotation marks omitted.) Id., 515. "When a defendant challenges personal jurisdiction in a motion to dismiss, the court must undertake a two part inquiry to determine the propriety of its exercising such jurisdiction over the defendant. The trial court must first decide whether the applicable state's long-arm statute authorizes the assertion of jurisdiction over the [defendant]. If the statutory requirements [are] met, its second obligation [is] then to decide whether the exercise of jurisdiction over the [defendant] would violate constitutional principles of due process." (Internal quotation marks omitted.) Id., 514–15. Thus, on the basis of the facts in the record, this court must determine whether our long arm statute, General Statutes § 52-59b,[2] properly applies to the defendant and, if that statutory threshold is met, whether the defendant, acting as executrix of the estate of the decedent, has the requisite minimum contacts with this state sufficient to satisfy constitutional due process concerns. See id.

In the present case, the defendant does not contest that the statutory threshold has been met. Indeed, she never cites § 52-59b in her primary appellate brief or in her reply brief. Rather, the defendant argues that her right to due process of law has been violated by the court's assertion of jurisdiction over her because she, personally, has no minimum contacts with our state. Specifically, she argues that "[a]lthough a long arm statute may change [the common-law rule regarding jurisdiction over a nonresident defendant] as a matter of state law, it does not alter the minimum contacts requirement under the United States constitution, which require[s] analysis into [the] [*d*]*efendant's* contacts with the forum state." (Emphasis in original.) Accordingly, we consider whether the exercise of personal jurisdiction over the defendant is proper under the due process clause of the fourteenth amendment to the federal constitution; see U.S. Const., amend. XIV, § 1; which limits the jurisdiction of state courts called

on to render judgments against nonresident defendants. See *Samelko* v. *Kingstone Ins. Co.*, 329 Conn. 249, 265, 184 A.3d 741 (2018), citing *Kulko* v. *Superior Court*, 436 U.S. 84, 91, 98 S. Ct. 1690, 56 L. Ed. 2d 132 (1978). We agree with the multitude of cases and § 358 of the Restatement (Second) of Conflict of Laws, which have considered this issue and have concluded that, if the relevant long arm statute would have permitted the court to exercise jurisdiction over *the decedent* had he been living, the due process clause of the federal constitution is not offended by that statute also permitting the exercise of jurisdiction over the decedent's executrix, who stands in the shoes of the decedent for purposes of the action. See 2 Restatement (Second), Conflict of Laws § 358, p. 421 (1971) ("[a]n action may be maintained against a foreign executor or administrator upon a claim against the decedent when the local law of the forum authorizes suit in the state against the executor or administrator and (a) suit could have been maintained within the state against the decedent during his lifetime because of the existence of a basis of jurisdiction other than mere physical presence").

"In the past, common law directed that an executor could only be sued in the state in which he was appointed. See *Martel* [v. *Stafford*, 992 F.2d 1244, 1246 (1st Cir. 1993)] (discussing Massachusetts common law rule); *Gandolfo* v. *Alford*, 31 Conn. Supp. 417, 333 A.2d 65, 66 (Ct. 1975) (stating 'that the general common-law rule is an executor or administrator of an estate can sue and be sued only in a jurisdiction in which he has been so appointed'). However, within the last several decades, many state legislatures have abrogated that common law notion by enacting long arm statutes which expressly provide for jurisdiction over the executor if jurisdiction could have been maintained over the decedent. See *Eubank Heights Apartments, Ltd.* v. *LeBow*, 615 F.2d 571, 574 (1st Cir. 1980) (concluding that jurisdiction over the decedent's estate was appropriate if the Texas long arm statute would have provided jurisdiction over the decedent had he not died); *Nile* v. *Nile*, 432 Mass. 390, 734 N.E. 2d 1153, 1159 (2000) (holding that the Massachusetts long-arm statute provides for jurisdiction over a non-resident personal representative when the decedent had sufficient contacts with the forum such that the decedent would have been subject to personal jurisdiction had he lived); *V.H.* v. *Estate of Birnbaum*, 543 N.W. 2d 649, 655 (Minn. 1996) (concluding that 'the decedent's foreign personal representative is subject to in personam jurisdiction under the long-arm statute if the decedent would be subject to jurisdiction if alive'); *Hayden* v. *Wheeler*, 33 Ill. 2d 110, 210 N.E. 2d 495, 497 (1965) (holding that the foreign administrator of a deceased non-resident was subject to jurisdiction under the Illinois state long-arm statute because decedent would have been subject to jurisdiction had he lived); *Gandolfo* [v. *Alford*], supra, [425]

(holding that Connecticut's long-arm statute modified the common law rule and granted Connecticut's courts jurisdiction over suits brought against an executor of a foreign estate when the non-resident decedent could have been sued in Connecticut if he had lived)." K. Hesse & C. Fields, "Representing Estate & Trust Beneficiaries & Fiduciaries: Get Me to the Court on Time: Jurisdiction and Choice," ALI-ABA Course of Study, SR003 ALI-ABA 67, 81–82 (July 2009).

"In deciding whether an executor is subject to suit in a particular jurisdiction, a [federal] district court looks to the law of the forum state. Many state long-arm [statutes] include the executor, administrator, or other personal representative of a person within the long-arm jurisdiction of a state as also being within the long-arm jurisdiction. It has generally been held that such [statutes] are constitutional even though only the decedent, and not his or her representative, had any contact with the forum jurisdiction . . . ." (Footnotes omitted.) 28 Fed. Proc., L. Ed. § 65:23 (June 2019 Update); see *Rosenfeld* v. *Hotel Corp. of America*, 20 N.Y.2d 25, 228 N.E.2d 374, 281 N.Y.S.2d 308 (1967) (thoroughly discussing constitutionality of state court obtaining in personam jurisdiction over nonresident executors, although such nonresident executors had committed no acts and transacted no business in state, but decedent had transacted such business); see also *SongByrd, Inc.* v. *Estate of Grossman*, 206 F.3d 172, 180–81 (2d Cir.), cert. denied, 531 U.S. 824, 121 S. Ct. 68, 148 L. Ed. 2d 33 (2000) ("[w]hether the [e]state is subject to long-arm jurisdiction in Louisiana with respect to SongByrd's cause of action depends on whether [the decedent] would have been subject to such jurisdiction during his lifetime"); *Crosson* v. *Conlee*, 745 F.2d 896, 900–901 (4th Cir. 1984), cert. denied, 470 U.S. 1054, 105 S. Ct. 1759, 84 L. Ed. 2d 822 (1985) ("There can be no doubt that personal jurisdiction could have been obtained over [the decedent] during his lifetime, as he had operated a business in Virginia . . . . Accordingly, we hold that personal jurisdiction was properly obtained over defendant, a Florida executor, under the Virginia long-arm statute, notwithstanding the absence of any assets of the decedent's estate in Virginia"); *Steego Corp.* v. *Ravenal*, 830 F. Supp. 42, 48 (D. Mass. 1993) ("Massachusetts courts will permit personal jurisdiction over an executor where there would have been personal jurisdiction over the testator while he was still living").

The defendant relies on three cases to support her contention that she, personally, must have sufficient minimum contacts with this state to support the court's exercise of jurisdiction over her. Specifically, she cites *Walden* v. *Fiore*, 571 U.S. 277, 134 S. Ct. 1115, 188 L. Ed. 2d 12 (2014), *Rush* v. *Savchuk*, 444 U.S. 320, 100 S. Ct. 571, 62 L. Ed. 2d 516 (1980), and *Hanson* v. *Denckla*, 357 U.S. 235, 78 S. Ct. 1228, 2 L. Ed. 2d 1283 (1958), for

the proposition that sufficient minimum contacts must arise out of the contacts that the defendant executrix, *personally*, had with the forum state. We conclude that each of those cases is inapposite from the present case. None of them involves or speaks to an action that could have been brought in the forum state *against a decedent* had he still been alive, but, instead, by necessity, due to the death of the decedent, was brought against the executrix of the decedent's estate, who stood in the shoes of the decedent for purposes of the action.

In the present case, the action brought by the plaintiff could have been brought against the decedent for the tortious acts *he committed while in this state*. The action names the defendant, not because of any act or failure to act on her part, but because she is standing in the shoes of the decedent. See 2 Restatement (Second), supra, § 358; id., comment (d), pp. 422–23; id., reporter's note to comment (d), pp. 425–26, and cases cited therein. Given the well established precedent on the constitutionality of a court's exercise of long arm jurisdiction in accordance with its statutory authority, we conclude that the court in the present case did not violate the defendant's right to due process of law by exercising jurisdiction over her because she had stepped into the shoes of the decedent when she became the executrix of his estate. Accordingly, the court properly denied the defendant's motion to dismiss.

## II

The defendant claims that the trial court improperly admitted certain evidence, which she claims was highly prejudicial and likely affected the outcome of the trial. Specifically, she argues that the court erred in (1) admitting "evidence of verbal and physical abuse allegedly perpetrated by [the decedent] on [the] plaintiff and [on] third parties," and (2) admitting "hearsay evidence[3] purporting to be from a 1997 journal, the original of which was discarded by [the] plaintiff's attorney during the course of [the] litigation." (Footnote added.) After setting forth our standard of review, we will consider each of these in turn.

"To the extent [that] a trial court's admission of evidence is based on an interpretation of the Code of Evidence, our standard of review is plenary. For example, whether a challenged statement properly may be classified as hearsay and whether a hearsay exception properly is identified are legal questions demanding plenary review. . . . We review the trial court's decision to admit [or exclude] evidence, if premised on a correct view of the law, however, for an abuse of discretion. . . . Additionally, [b]efore a party is entitled to a new trial because of an erroneous evidentiary ruling, he or she has the burden of demonstrating that the error was harmful. . . . The harmless error standard in a civil case is whether the improper ruling would

likely affect the result." (Internal quotation marks omitted.) *LM Ins. Corp.* v. *Connecticut Dismanteling, LLC*, 172 Conn. App. 622, 627–28, 161 A.3d 562 (2017).

## A

The defendant claims that the court erred in admitting evidence of verbal and physical abuse committed by the decedent and that such evidence was highly prejudicial, likely affecting the outcome of the trial. She argues that she "filed a motion in limine seeking to preclude evidence of claimed verbal and physical abuse of [the] plaintiff's brothers (Jonathan [Spalter], Alan [Spalter], and Michael Spalter) on the ground that such evidence was not relevant and constituted improper character and/or propensity evidence, particularly because it effectively allowed statutorily time-barred claims of third parties to be brought before the jury. . . . The trial court denied the motion in limine . . . . The trial court erred by admitting this evidence." (Citation omitted.)

The plaintiff argues that the evidence was relevant to explain the plaintiff's fear of the decedent and why she delayed reporting his sexual abuse, and that the defendant failed to object to much of the testimony that she now claims was admitted improperly. The plaintiff contends that the defendant's motion in limine did not serve to preserve her objections to each and every bit of testimony related to the decedent's verbal and physical abuse of the plaintiff and her brothers because the court stated that it was delaying its ruling on the admissibility of this evidence until it was offered at trial, thereby necessitating that the defendant object to the specific evidence as it was being offered. The plaintiff also argues that any improper admission by the trial court was harmless.

The following additional facts inform our review. The defendant filed a motion in limine to "preclude evidence of alleged other crimes, wrongs, or bad acts" committed by the decedent, including alleged physical or emotional abuse by the decedent against the family dog, the plaintiff, and the plaintiff's brothers, on the ground that it was "improper character and/or propensity evidence." She also argued that the evidence was not relevant and that its prejudicial effect significantly would outweigh its probative value. The court held a hearing on the defendant's motion, and other items, on February 7, 2017, at which the court explained, "Connecticut Code of Evidence [§ 4-5][4] appl[ies] to both civil and criminal cases. . . . So, what this means, to the extent evidence of [the decedent's] abuse of other people and the dog . . . are offered, I will need to do a two part test before I can admit it. I have to make a determination as to relevance, and I also have to weigh the probative value of the evidence against the prejudicial effect of the evidence, and that needs to be done . . . out of the hearing of the jury." (Footnote added.) Consistent with

this explanation, the court, also on February 7, 2017, issued a short written ruling denying the motion in limine because "[e]vidence of other wrongs and acts is admissible for certain purposes pursuant to [§] 4-5 (c) of the Connecticut Code of Evidence, provided it is relevant and that its probative value outweighs any prejudicial effect."

The record reflects that the defendant clearly was told that the court, although denying the motion in limine, was reserving judgment on specific objections to evidence of other wrongs or acts until the evidence was offered at trial. Later in the February 7, 2017 hearing, the parties were discussing the admissibility of portions of depositions regarding allegations of physical and emotional abuse committed by the decedent to which the defendant objected. The plaintiff's attorney told the court that he would be telling the jury during opening argument that the plaintiff was terrified of the decedent because of his sexual abuse and his violent acts toward her, her brothers, and her dog. He also stated that he would explain to the jury that this is why she waited until he died to disclose this abuse publicly and file this action; it helped to explain her fearful state of mind during his lifetime. The defendant's attorney responded: "The fact that opposing counsel wants to make some statements in opening argument about evidence that may or may not come in is his choice. The court doesn't have before it the information at this point in time sufficient to rule [on] whether . . . the evidence that will be offered comes in under [§ 4-5 (c) of the Connecticut Code of Evidence]. There are significant issues about that evidence. We would be severely prejudiced by the introduction of evidence. . . . And so, if counsel wants to make statements in opening argument, he can state whatever he wants to, but, as [with] any opening argument, Your Honor, you take the chance if you want to make statements about evidence that may or may not come in; that's their choice. The court should not make rulings on evidence at this point in time based upon what [the] plaintiff's counsel says he wants to say in opening argument." The court responded: "All right then. What I understand you [to] say is you would object to my ruling, but not to him raising these, these concepts."

The following day, February 8, 2017, when the plaintiff was on the witness stand, she brought up an incident involving the decedent and her brothers, and the following colloquy occurred:

"[The Defendant's Attorney]: Your Honor, may I state my objection for the record?

"The Court: Sure. . . . Yes, go ahead.

"[The Defendant's Attorney]: Okay. And so I would object and move to strike that response to the extent that, again, Your Honor, it seems to have been nonre-

sponsive to the question that I understood [the plaintiff's attorney to be] asking, which was directed at an incident of alleged sexual abuse. And we claim that objection based on the fact that we have a pending objection to incidents of physical abuse.

"The Court: Well, let's be clear about that. I don't acknowledge a pending objection.[5] There is—you [filed] a motion in limine, and I said we would take it in turn, as necessary. But I do not—pending objections are not favored in Connecticut practice, and I don't [favor them] either. So, and it hasn't stopped you from raising objections when you felt it appropriate. And, so that's the status of that. In terms of this one, I'll reserve [ruling] pending connection to the witness.

"[The Defendant's Attorney]: Thank you, Your Honor. And I understand that, thank you."

The defendant now argues that her motion in limine preserved her objections to every instance of evidence regarding allegations that the decedent committed acts of physical, verbal, or emotional abuse.[6] We disagree. The court explained to the parties during the hearing on the defendant's motion in limine that its denial of the defendant's motion was only a preliminary ruling, because it thought that some of the evidence likely would be admissible at trial. Additionally, the court clearly reiterated, the following day, that the defendant was required to object to specific evidence at the time it was offered, and it told the defendant that it would not recognize a standing objection to evidence on this issue; the defendant's attorney then told the court that he understood.

We conclude, therefore, that in order to preserve her objections, the defendant needed to object each time evidence was offered on the issue so that the court could consider the evidence in the context for which it was being offered. See *Birkhamshaw* v. *Socha*, 156 Conn. App. 453, 468, 115 A.3d 1 (objections not preserved by motion in limine when court clearly stated it would not rule in vacuum by issuing blanket prohibition because some evidence might be admissible; court left issue "open for objection during trial as specific testimony was offered"), cert. denied, 317 Conn. 913, 116 A.3d 812 (2015). Accordingly, after setting forth additional relevant facts, we will examine the specific evidence that the defendant in her appellate brief now claims was admitted improperly.

In response to the plaintiff's revised complaint, the defendant filed five special defenses, including a defense that "[t]he plaintiff's claims are barred or diminished to the extent she failed to take proper and reasonable steps to avoid or mitigate damages." The plaintiff denied each of the special defenses. As explained previously in this opinion, the plaintiff's attorney told the court that he would be telling the jury during his opening

statement that the plaintiff was terrified of the decedent because of his sexual abuse and his violent acts toward her, her brothers, and her dog, and that this was why she waited until he died to disclose this abuse and file this action. He said this information would be used to explain her fearful state of mind during the decedent's lifetime and her inability to bring an action before his death. The defendant's attorney responded by saying that counsel could argue whatever he wanted during his opening statement but that it did not mean the evidence of which he spoke would be admissible.

During opening argument, the plaintiff's attorney argued, in part, that he believed that the evidence would show that the decedent "serially and repeatedly abused [the plaintiff] sexually for his own gratification from the time she was six years old to the time she was seventeen, [and] that he kept her in abject fear of him for his entire life by his acts and his violence that she witnessed as a child . . . ." The defendant's attorney argued: "[W]e expect that [the plaintiff] will come into court and take the [witness] stand and testify that she was afraid to bring this suit or to bring a suit during [the decedent's] lifetime. In fact, we expect [the plaintiff] to come in and testify that she thought about suing [the decedent] . . . for years and that she even thought about it as far back as the 1990s, but that she couldn't bring herself to do it. She only found the courage after [the decedent] died. But, we think that once you've heard everything, once you've listened to the testimony, once you've seen the record, the evidence that comes in, that [the] evidence will tell a very different story. And that story . . . is that [the decedent's] death is actually the reason for this lawsuit, because when [the decedent died] . . . he left a will. And [the decedent's] will favors his wife . . . ." The defendant's attorney also argued that the evidence would show that the plaintiff maintained a close affectionate relationship with the decedent up until the time of his death but that, when the decedent died, and his will was disclosed, "that's when things change[d]. And we think the evidence in this case will show that that is the reason for this lawsuit . . . ."

The defendant now claims that all of the testimony from the plaintiff and her brothers regarding the decedent's violent and physically abusive behavior should have been excluded by the court. The plaintiff argues that this evidence was necessary because the defense sought to attack the plaintiff's motivation for filing the action after the decedent's death, and the evidence, therefore, was necessary to explain why she delayed her action. The plaintiff also contends that the defendant raised objections to approximately one half of the testimony concerning the violence of the decedent and that some of the objections were on grounds other than improper character evidence. Accordingly, the plaintiff argues that any impropriety by the court in overruling

the defendant's limited objections was harmless in light of the overwhelming additional evidence to which there was no objection. We agree with the plaintiff.

In her appellate brief, the defendant cites several instances of testimony given by the plaintiff and her brothers. We will look at each of these instances, as well as other cumulative testimony by these witnesses to which the defendant did not object or that was brought out during the defendant's cross-examination.

At the start of the plaintiff's testimony, her attorney asked what her earliest recollection was of the decedent. The plaintiff stated that she remembered a very violent man. The defendant objected and asked that the response be stricken, but the court allowed the testimony to continue. The plaintiff then explained to the jury that the decedent would "hit, scream, punch, kick, [and] spit . . . ." The defendant again objected, and the court overruled the objection stating that the testimony went to explain the state of mind of the plaintiff. The plaintiff continued: "I saw [the decedent] punching, screaming, hitting my brothers on a regular basis. He would slap me and punch—punch me and pull my—pull me and throw me, and he also punched and kicked my dog. And he would scream, and he looked like a monster, you know, spitting and beady eyes, and that's what I observed."

The defendant also points to additional testimony by the plaintiff regarding the decedent having an ulcer and his anger. Specifically, the plaintiff testified: "[T]here was an incident where [the decedent]—I was about nine. . . . [He] had an ulcer and the violence was—[he] would get so angry." The defendant objected, and the court overruled the objection.

During cross-examination, however, the defendant's attorney asked the plaintiff if she thought the decedent was a "monster" because she "saw him do things regularly such as punch and kick and scream and spit," to which the plaintiff responded in the affirmative. When questioning the plaintiff about her decision to associate with the decedent in 2004, the defendant's attorney also asked: "And in fact, you were in fear of [the decedent] throughout your childhood because of his anger and volatility?" The plaintiff answered, "Yes." Counsel then asked: "Okay. And you were in fear of him because of the physical violence that he displayed in front of you . . . and you were in fear of him because of his physical abuse of your brothers that you witnessed . . . ?" The plaintiff, again, responded in the affirmative. Counsel then asked, "But still you chose to associate with him in 2004?" The plaintiff answered, "I did."

The defendant also argues that the court improperly admitted the following testimony by Alan Spalter: "Our house in Connecticut was a house filled [with] basically fear and terror. It was a house that we had a daily,

almost daily verbal abuse and physical abuse. Verbal abuse in terms of being yelled at, screamed at. . . . Physical abuse by [the decedent] included kicking, punching, and hitting. These are all based on the fact that [the decedent] was really a powder keg waiting to go off at any moment for any type of indiscretion, any kind of—if we displeased him in any way, there were consequences. He ruled the house as a dictator. And, if we did anything to displease him, there were consequences. . . . Back in the day when there were no sprinkler systems, underground sprinkler systems, we had to move the hose from one end of the lawn to the other, and I was doing that, and I sprayed [the plaintiff] playfully with the sprinkler, and I . . . got [the decedent] wet . . . . He enraged, got out of his chair, ran after me, tackled me to the ground, put his knee on my back, arm on my head, buried it into the ground, and yelled at me, apologize." This testimony, however, was presented at trial *without objection* by the defendant.

The defendant also argues that certain testimony of Jonathan Spalter improperly was admitted. Specifically, she argues: "Jonathan Spalter testified that on one occasion, [the decedent] punched him in the stomach, grabbed him by the hair, and threw him down on the ground. . . . He then testified as to several more supposed incidences of violence, including [the decedent's] purportedly hitting him and [the] plaintiff while in the car, a separate claimed road rage incident, and an additional incident involving alleged physical abuse of his brother, Michael Spalter."[7] The defendant, however, raised no objection to that testimony when it was offered at trial.

The defendant also argues: "Over objection of defense counsel, Jonathan Spalter testified: '[The plaintiff], my brother Alan, my brother Michael, and myself were in a horror house' . . . . He later testified, also over objection, that he 'wanted [the decedent] to know how gravely hurt I've remained by all of the abuse, myself, and my brother, and [the plaintiff], particularly [the plaintiff], endured at his hands . . . .'"

A review of the transcripts also reveals that during cross-examination by the defendant's attorney, Jonathan Spalter was asked about his anger toward the decedent, and he replied in relevant part: "I was angry at [the decedent] for many things. The most important thing that I've been angry at [him] at that time was about the fact that he had admitted to me that he sexually abused [the plaintiff] and the years of abuse, verbal and physical, that I, and my brother Alan, and my brother Michael suffered." Jonathan Spalter also testified during cross-examination, when asked about an e-mail sent to him by the decedent, alleging that he had engaged in personal attacks against the decedent: "No, I never made attacks at [the decedent]. I told him the plain truth as I knew the truth to be, that I was hurt

and my family was hurt because of the years of abuse that he perpetrated physically, emotionally, and sexually against [the plaintiff]. These were not attacks. These were shining a mirror at [the decedent] and letting him know how sad and how much he's impacted me, and particularly [the plaintiff] through his life, and also registering my deep disappointment and my protected instinct for my children, my sweet children, that this is a man who didn't have the basic human decency to be even remotely close to treating grandchildren as they should be treated, which is having some level of communication with them."

On the basis of the record and the objections voiced by the defendant's attorney to some of the testimony, as specifically set forth in this opinion, we conclude that even if we were to agree that the court improperly overruled each of those objections, the defendant has not established that the error was harmful. There simply was a mound of similar testimony to which the defendant did not object, much of which was much more in-depth than that to which she did object during trial.

"When a court commits an evidentiary impropriety, we will reverse the trial court's judgment only if we conclude that the trial court's improper ruling harmed [a party]. . . . In a civil case, a party proves harm by showing that the improper evidentiary ruling likely affected the outcome of the proceeding. . . . It is well established that if erroneously admitted evidence is merely cumulative of other evidence presented in the case, its admission does not constitute reversible error. . . . In determining whether evidence is merely cumulative, we consider the nature of the evidence and whether any other evidence was admitted that was probative of the same issue as the evidence in controversy." (Citations omitted; internal quotation marks omitted.) *DeNunzio* v. *DeNunzio*, 320 Conn. 178, 204, 128 A.3d 901 (2016).

As previously discussed in this opinion, the defendant objected to some of the plaintiff's testimony wherein she described the decedent's violence against his children and the plaintiff's dog. She also objected to some of the testimony of Jonathan Spalter wherein he testified that they had lived in a "horror house" and that he wanted the decedent to know that he and his siblings were hurt by the decedent's abuse.

The defendant then cross-examined the plaintiff on those issues. Additionally, during the defendant's cross-examination of Jonathon Spalter, he was asked about his anger toward the decedent, which elicited a response about the physical and verbal abuse perpetrated by the decedent. He also was questioned about an e-mail sent to him by the decedent, which elicited further testimony about the years of abuse. Alan Spalter also testified on direct examination, without objection, about the daily physical and verbal abuse perpetrated

by the decedent, and he referenced a specific violent event that had been witnesses by the plaintiff; he also testified, without objection, that their Connecticut home was filled with "fear and terror." The record reveals that the testimony to which the defendant objected merely was cumulative of other similar testimony to which she did not object. Accordingly, she has failed to show that the trial court's rulings, even if we assume that they were improper, likely affected the outcome of the trial.[8]

B

The defendant also claims that the "trial court committed reversible error by admitting hearsay evidence purporting to be from a 1997 journal, the original of which was discarded by plaintiff's attorney during the course of litigation." She argues that the court improperly admitted the entries under the state of mind exception to the hearsay rule; see § 8-3 (4) of the Connecticut Code of Evidence;[9] and that the court should have excluded the journal entries because the original journal was discarded by the plaintiff's "attorney." We are not persuaded.

The following additional facts inform our review. After the discovery deadline had passed, the plaintiff disclosed the existence of a 1997 journal, which her attorney represented recently had been discovered among the plaintiff's possessions kept in a storage facility, and a copy was provided to the defendant and the court. After some time had passed and the plaintiff had failed to produce the original journal, the defendant filed a motion for sanctions, and the court ordered the plaintiff to produce the original journal. At a subsequent status conference, the plaintiff's attorney explained to the court that after the plaintiff found the journal in a storage facility, she made a photocopy of its pages so that she could e-mail them to him, as she had done with previous documents. Her attorney further explained that there had been a mix-up concerning whether the original journal had been included in the items placed in a shipping crate to be returned to Austria, where the plaintiff was living. Eventually, however, the plaintiff came to believe that the original journal inadvertently had been thrown away by the plaintiff's cousin, Laura Phillips, with whom the plaintiff was staying when she discovered the journal. The court requested an affidavit from Phillips, which she provided the following day.

In her affidavit, Phillips averred, among other things, that she is an attorney licensed to practice law in New York; she had not worked with the plaintiff's attorneys of record on this case; she and the plaintiff are cousins, and they have a close relationship; the plaintiff had stayed with her for approximately one month in July and August, 2016, while visiting here from Austria; during the plaintiff's visit, they had retrieved approximately

fifty boxes of belongings from the plaintiff's storage unit; she and the plaintiff sorted through the boxes and reduced them to approximately eighteen boxes that they shipped to the plaintiff's home in Austria; many of the items set aside to be discarded included papers, notebooks, books, etc., which were strewn about Phillips' apartment; the plaintiff also had set aside a stack of papers to be kept at Phillips' apartment; Phillips told the plaintiff that she would discard the items left over from the storage unit; and although Phillips remembered seeing the journal, which had Spanish writing on the cover, she thought she may have inadvertently thrown it away believing it was her daughter's old notes from Spanish class.

The defendant then renewed her motion for sanctions, alleging discovery misconduct and destruction of evidence. The court denied the motion, finding no evidence of wilful misconduct, but it did permit further deposition questioning.

During the trial, the plaintiff's attorney sought to introduce into evidence the photocopy pages from the 1997 journal. The defendant objected on the grounds of spoliation and lack of authentication. The court overruled the objection, opining that the "absence of the original was adequately explained." The defendant then objected to the introduction of all of the excerpts of the journal that the plaintiff sought to introduce on the grounds of hearsay and undue prejudice. Outside the presence of the jury, the court went through each excerpt, listened to the argument of counsel, and determined that the excerpts were admissible.

The defendant now claims that the court misconstrued the state of mind exception to the hearsay rule; see § 8-3 (4) of the Connecticut Code of Evidence; leading to its improper admittance of certain excerpts of the plaintiff's journal. She argues, "[t]he admission of the self-serving hearsay statements is especially troubling in a case with no living first-hand witnesses who could confirm or deny the alleged abuse, no contemporaneous written records corroborating [the] plaintiff's account of events, and very little written corroboration of events at *any time* prior to the [the] plaintiff's filing of the instant lawsuit." (Emphasis in original.)

The defendant in her appellate brief specifically addresses two excerpts from the journal, which she argues improperly were admitted into evidence by the court. The first excerpt cited by the defendant is as follows: "All day I have been thinking about the sickening stuff that [the decedent] does. It is so disturbing."[10] The second excerpt from the journal contains a letter that the plaintiff wrote to [the decedent], which she never sent. Specifically, the defendant objects to the following portions: "You fondled my genitalia. . . . I always pretended to be asleep. . . . You recall only one incident. So one of us is inaccurate. I

swear on my mother's grave and on my nephews' lives I know the incest you did actions to be true. . . . I see you screaming and beating up your children as using poor judgment."[11] (Internal quotation marks omitted.) Immediately after the introduction of these excerpts, the court gave a limiting instruction: "So now, ladies and gentlemen, once again, this is admitted to show [the plaintiff's] state of mind at the time she wrote this and is not for proof of any of the events that she discusses there. It's to show you what was going on in her mind at the time." The defendant also asserts in passing that the court's limiting instruction to the jury was insufficient to limit "the impact of the self-serving accusatory statements . . . ."

The plaintiff responds that the journal excerpts were necessary to provide proof of her claim for emotional damages. She also argues that the defendant "cherry picks objectionable sentences [from the excerpts] when [she] made only a general objection in the trial court to the entire thing." Furthermore, she argues, the prejudicial impact of the journal excerpts caused by any statements concerning abuse contained therein was minimal and cumulative in light of all the other evidence at trial. We conclude that even if these excerpts improperly were admitted, the evidence merely was cumulative of considerable other evidence, and the defendant has failed to prove that the improper admission of the excerpts likely affected the outcome of the trial. See *Fink* v. *Golenbock*, 238 Conn. 183, 211, 680 A.2d 1243 (1996) ("[i]t is well recognized that any error in the admission of evidence does not require reversal of the resulting judgment if the improperly admitted evidence is merely cumulative" [internal quotation marks omitted]).

At trial, the plaintiff testified extensively about the decedent's sexual abuse. Jonathan Spalter testified about seeing the decedent naked in the plaintiff's bedroom. He also testified, in response to questioning from the defendant's attorney, that the decedent admitted to sexually assaulting the plaintiff once. Additionally, as fully explained in part II A of this opinion, there was other evidence of physical and emotional abuse, as well. Alan Spalter testified, *without objection*, that the family home was filled with "fear and terror . . . [and] almost daily verbal abuse and physical abuse . . . [that] included kicking, punching, and hitting." Jonathan Spalter also testified, *without objection*, about specific instances of physical violence committed by the decedent. Finally, the defendant did not object during trial to the admission of other journal excerpts written by the plaintiff in 1995 and 1996. Those excerpts included several references to incest, including a statement by the plaintiff that "[she] was incested at [eleven] years old by [the decedent]." Because the jury was privy to this evidence, it is not reasonable to conclude that the excerpts from the 1997 journal likely affected the ver-

dict. We cannot conclude, therefore, that any purported error in their admission was harmful.

## III

The defendant claims that the trial court improperly permitted the jury to find her liable for punitive damages without evidence of the plaintiff's litigation expenses and that the court improperly reserved to itself the issue of the amount of punitive damages to be awarded. Specifically, she argues: "During the charging conference . . . defense counsel objected to the trial court charging the jury on the issue of punitive damages on the grounds that the amount of common-law punitive damages is an issue for the jury, and because there was no evidence upon which the jury could base such an award. . . . The trial court disagreed based on its past practices, instructing the jury to determine whether punitive damages should be awarded, and that the court would later determine the amount of such damages. . . . This was error." (Citations omitted; footnote omitted.)

The plaintiff argues that there is no final judgment on the issue of punitive damages, and, therefore, we are unable to review this claim. In the alternative, she argues that the court properly ruled that it would reserve the amount of punitive damages for its own consideration, after the jury determined whether the defendant was liable for such damages. Furthermore, the plaintiff argues, even if it were improper for the court not to let the jury decide the amount of punitive damages, we should remand the matter for a hearing limited to that issue. We begin with the complicated issue of whether there is a final judgment as to punitive damages.

## A

"The lack of a final judgment implicates the subject matter jurisdiction of an appellate court to hear an appeal. A determination regarding . . . subject matter jurisdiction is a question of law [and, therefore] our review is plenary. . . .

"Neither the parties nor the trial court . . . can confer jurisdiction upon [an appellate] court. . . . The right of appeal is accorded only if the conditions fixed by statute and the rules of court for taking and prosecuting the appeal are met. . . . It is equally axiomatic that, except insofar as the legislature has specifically provided for an interlocutory appeal or other form of interlocutory appellate review . . . appellate jurisdiction is limited to final judgments of the trial court. . . .

"It is well settled that a judgment rendered only upon the issue of liability without an award of damages is interlocutory in character and not a final judgment from which an appeal lies. . . . Nevertheless, [under the bright line rule announced in *Paranteau* v. *DeVita*, 208 Conn. 515, 544 A.2d 634 (1988)] a judgment on the

merits is final for purposes of appeal even though the recoverability or amount of attorney's fees for the litigation remains to be determined." (Citations omitted; internal quotation marks omitted.) *Ledyard* v. *WMS Gaming, Inc.*, 330 Conn. 75, 84, 191 A.3d 983 (2018).

In *Ledyard*, the defendant had appealed from the summary judgment rendered in favor of the plaintiff, as to liability only, with respect to certain attorney's fees that had been incurred by the plaintiff. See *Ledyard* v. *WMS Gaming, Inc.*, 171 Conn. App. 624, 625, 157 A.3d 1215 (2017), rev'd, 330 Conn. 75, 191 A.3d 983 (2018). This court concluded that the trial court's decision rendering summary judgment, as to liability only, with regard to the attorney's fees at issue was not an appealable final judgment because the amount of damages had not been determined at the time the appeal was filed. Id., 625. Following the granting of certification to appeal, our Supreme Court reversed this court's decision, concluding that there was a final judgment, despite the fact that the trial court had not yet determined the amount of attorney's fees that would be awarded. *Ledyard* v. *WMS Gaming, Inc.*, supra, 330 Conn. 90.

In *Ledyard*, our Supreme Court began its final judgment analysis by discussing *Paranteau*. Id., 84–87. The court explained that, in *Paranteau*, "[b]y opting for a bright line rule, [it had] implicitly recognized that there would be some cases . . . in which the application of the bright line [rule] would mean that an attorney's fees award that would otherwise be considered integral to the judgment on the merits would nevertheless be severable from that judgment for purposes of finality." (Internal quotation marks omitted.) Id., 87. It is noteworthy to mention that the court in *Paranteau*, however, also issued a caveat to the bright line rule by explaining, in footnote 11 that "[a] supplemental postjudgment award of attorney's fees becomes final and appealable, however, not when there is a finding of liability for such fees, but when the amount of fees are conclusively determined. A finding as to liability only, prior to a determination on the issue of damages, is not a final judgment from which an appeal lies. . . . Furthermore, a timely appeal from a supplemental postjudgment award of attorney's fees may challenge not only the amount awarded, but the underlying recoverability of such fees as well." (Citation omitted.) *Paranteau* v. *DeVita*, supra, 208 Conn. 524 n.11.

The court in *Ledyard* then went on to discuss *Hylton* v. *Gunter*, 313 Conn. 472, 487, 97 A.3d 970 (2014). See *Ledyard* v. *WMS Gaming, Inc.*, supra, 330 Conn. 87–90. In *Hylton*, our Supreme Court, relying on *Paranteau*, had explained that it could not conceive of a reason "why the benefits of the bright line rule articulated in *Paranteau* do not apply equally in the context of common-law punitive damages, which are limited under Connecticut law to litigation expenses, such as attor-

ney's fees less taxable costs. . . . The assessment a court is required to make in order to award punitive damages is identical to the assessment required in any other matter involving a common-law, contractual, or statutory basis for departure from the American rule . . . . Indeed, common-law punitive damages are akin to statutorily authorized attorney's fees in practicality and purpose, insofar as both provide the same relief and serve the same function . . . namely, fully compensating injured parties. . . . Thus, our practical approach to the matter suggests that what is of importance here is not preservation of conceptual consistency in the status of a particular fee authorization as merits or nonmerits, but rather preservation of operational consistency and predictability in the overall application of [the final judgment rule]. . . . Accordingly, we conclude that an appealable final judgment existed when all that remained for the trial court to do was determine the amount of the attorney's fees comprising the common-law punitive damages that it previously had awarded." (Citations omitted; footnotes omitted; internal quotation marks omitted.) *Hylton* v. *Gunter*, supra, 484–87.

In *Hylton*, our Supreme Court also overruled this court's decision in *Lord* v. *Mansfield*, 50 Conn. App. 21, 717 A.2d 267, cert. denied, 247 Conn. 943, 723 A.2d 321 (1998). *Hylton* v. *Gunter*, supra, 313 Conn. 487–88. In *Lord*, this court held that the judgment that had been rendered on the defendant's counterclaim for intentional infliction of emotional distress had not been final for purposes of appeal because the plaintiff's claim on appeal concerned the amount of the damages awarded on that counterclaim and the trial court had not determined the amount of common-law punitive damages that were due as part of the compensation to the defendant on that counterclaim. *Lord* v. *Mansfield*, supra, 24, 25 n.3, 28. In *Hylton*, our Supreme Court determined that "*Lord* was wrongly decided because, among other reasons, it [was] inconsistent with . . . *Paranteau* . . . which adopted the bright line rule that a judgment on the merits is final for purposes of appeal even though the recoverability or amount of attorney's fees for the litigation remains to be determined." (Citation omitted; internal quotation marks omitted.) *Hylton* v. *Gunter*, supra, 474–75.[12]

After discussing *Hylton*, our Supreme Court, in *Ledyard*, returned to *Paranteau* and further limited the application of footnote 11 of that decision: "Footnote 11 of *Paranteau* can be explained as part of an effort to save jurisdiction over that appeal given the facts of that particular case, which predated our clarification in *Ambroise* v. *William Raveis Real Estate, Inc.*, 226 Conn. 757, 762–63, 628 A.2d 1303 (1993), that the twenty day time limitation for filing an appeal set forth in Practice Book § 63-1 (a) is not subject matter jurisdictional. See *Benvenuto* v. *Mahajan*, [245 Conn. 495, 503–505

and n.4, 715 A.2d 743 (1998)]. Nevertheless, footnote 11 is in tension with *Paranteau's* bright line rule as it has been extended in *Benvenuto* and *Hylton*. Although the Appellate Court has dismissed several appeals following the rationale of *Paranteau's* footnote 11 . . . we observe that the footnote must be considered in the context of this court's subsequent decisions in *Benvenuto* and *Hylton*, which emphasize the importance of the bright line rule with respect to attorney's fees awards that are not rendered postjudgment." (Citation omitted.) *Ledyard* v. *WMS Gaming, Inc.*, supra, 330 Conn. 91 n.5.

In conducting our final judgment rule analysis, we next review a recent case in which our Supreme Court denied a motion to dismiss that had been filed by the defendant in error in that case, who had sought dismissal on final judgment grounds of a writ of error. See *Maurice* v. *Chester Housing Associates Ltd. Partnership*, 188 Conn. App. 21, 24 n.5, 204 A.3d 71, cert. denied, 331 Conn. 923, 206 A.3d 765 (2019). In *Maurice*, the plaintiff in error, Douglas Williams, who was the general and managing partner of one of the defendants in the underlying case, but not a party himself, had been sanctioned and ordered to pay the attorney's fees of the plaintiff. Id., 22. Williams filed a writ of error in our Supreme Court before the trial court had determined the amount of the fees for which Williams would be liable. Id., 24 n.5. The plaintiff, who was the defendant in error on appeal, filed a motion to dismiss on the ground that the writ was not taken from a final judgment because the trial court had yet to determine the amount of fees for which Williams would be responsible. Id. Our Supreme Court denied the motion to dismiss and transferred the writ to this court to be considered on the merits. Id.

This court explained the issue regarding whether the appeal was taken from a final judgment as follows: "On September 4, 2018, prior to oral argument of this case before this court, our Supreme Court released its decision in *Ledyard* v. *WMS Gaming*, Inc., [supra, 330 Conn. 75]. In *Ledyard*, the Supreme Court ruled that the Appellate Court wrongly dismissed, for lack of a final judgment, an appeal taken from a judgment that determined only that the defendant was liable for attorney's fees. The Supreme Court ruled that the trial court's determination that the defendant was liable for attorney's fees was an appealable final judgment, despite the fact that the amount of those fees had not yet been determined. The Supreme Court found that, in dismissing the appeal, the Appellate Court had wrongly relied on a footnote in *Paranteau* v. *DeVita*, [supra, 208 Conn. 524 n.11], for the proposition that a trial court does not render a final judgment as to attorney's fees until it conclusively determines the amount of those fees. The Supreme Court held that the language in *Paranteau* applies only to 'supplemental postjudgment awards of attorney's

fees.' *Ledyard* v. *WMS Gaming, Inc.*, supra, 90.

"Here, the order that Williams be sanctioned and that he pay attorney's fees is a final judgment under *Ledyard*—notwithstanding the fact that the trial court has yet to determine the amount of those fees—because it does not constitute a supplemental postjudgment award of attorney's fees." *Maurice* v. *Chester Housing Associates Ltd. Partnership*, supra, 188 Conn. App. 25 n.5.

Presumably then, Williams could file *an appeal* after the trial court orders the specific amount of fees for which he will be liable, contesting the reasonableness of the amount. See id. As explained by Attorneys Wesley W. Horton and Kenneth J. Bartschi, "*Paranteau* has been extended to a strict foreclosure case in *Benvenuto* v. *Mahajan*, [supra, 245 Conn. 495], which rejects the contrary result in *Connecticut Nat*[*ional*]. *Bank* v. *L & R Realty*, 40 Conn. App. 492, 671 A.2d 1315 (1996); to a case in which the right to punitive damages has been determined but the amount has not; *Hylton* v. *Gunter*, [supra, 313 Conn. 472], overruling *Lord* v. *Mansfield*, [supra, 50 Conn. App. 21]; and even to a case when the attorneys' fee award is integral rather than collateral to the underlying award. *Ledyard* v. *WMS Gaming, Inc.*, [supra, 330 Conn. 75]." W. Horton & K. Bartschi, Connecticut Practice Series: Connecticut Rules of Appellate Procedure (2018-2019 Ed.) § 61-1, authors' comments, p. 68.

As we attempt to reconcile all of these cases and arrive at a workable final judgment rule, we conclude as follows: a judgment that includes an award of attorney's fees, even when those fees are integral to the judgment, as with an award of common-law punitive damages, is an appealable final judgment despite the fact that the amount of those fees has not yet been determined; implicit in this rule is that once the amount of those fees has been determined postjudgment, that postjudgment determination will be a separately appealable final judgment as to the reasonableness of the fees awarded.

On the basis of the foregoing, we conclude that the jury's determination that the plaintiff is entitled to common-law punitive damages is a final judgment for purposes of appeal because it does not constitute a supplemental postjudgment award, despite the fact that the trial court reserved a determination of the precise amount of those damages to a time postjudgment.

B

We next consider the merits of the defendant's claim that the trial court improperly permitted the jury to find her liable for punitive damages without evidence as to the plaintiff's litigation expenses, and that the court improperly reserved to itself the issue of the amount of punitive damages to be awarded.

The following facts assist with our review. Before

the plaintiff began her presentation of evidence, the defendant submitted to the court a request to charge and her proposed jury interrogatories. She requested, in part, that, if the court were to permit a consideration of punitive damages in this case, it submit the question of punitive damages and the amount of those damages to the jury. Then, during the charging conference, which was held after the close of evidence, the defendant asked the court not to charge the jury on punitive damages because the plaintiff had failed to put forth any evidence of her litigation expenses, and she, again, told the court that, if the issue of punitive damages went to the jury, the court must have the jury determine the amount of those damages. The plaintiff argued that, although the liability for punitive damages is a jury question, the amount of the award is a question for the court, to be determined after the jury issued its verdict. She expressed to the court that there would be no way to "know the cost of litigation until we are done with the trial." The court agreed with the plaintiff, stating that this was its past practice when common-law punitive damages were involved, and it stated that it would determine the amount of damages if the jury found that the defendant was liable for punitive damages. The defendant, following the court's charge to the jury, also took an exception to the court instructing the jury on punitive damages. On appeal, the defendant claims that the court improperly permitted the jury to find her liable for common-law punitive damages without evidence as to the plaintiff's litigation expenses, and that the court improperly reserved for its own consideration the specific amount of common-law punitive damages to be awarded. We agree with the defendant.

The defendant asks that we apply a plenary standard of review to her claim. We agree that this is the appropriate standard of review. "A challenge to the validity of jury instructions presents a question of law. Our review of this claim, therefore, is plenary. . . . We must decide whether the instructions, read as a whole, properly adapt the law to the case in question and provide the jury with sufficient guidance in reaching a correct verdict. . . . [T]he test of a court's charge is . . . whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law." (Citation omitted; internal quotation marks omitted.) *Green* v. *H.N.S Management Co.*, 91 Conn. App. 751, 757–58, 881 A.2d 1072 (2005), cert. denied, 277 Conn. 909, 894 A.2d 990 (2006). "It is established law that it is error for a court to submit to the jury an issue which is wholly unsupported by the evidence." *Novak* v. *Anderson*, 178 Conn. 506, 508, 423 A.2d 147 (1979).

The precise issue presented by this claim does not appear to have been addressed squarely by an appellate court in Connecticut, at least in quite some time. We are aware, however, of at least one Connecticut case

in which this issue squarely was raised on appeal on constitutional grounds, but our Supreme Court did not decide the issue because it was unpreserved before the trial court. See *Berry* v. *Loiseau*, 223 Conn. 786, 822, 614 A.2d 414 (1992) (plaintiff failed to preserve claim that he had constitutional right to have jury determine amount of punitive damage award, not just plaintiff's entitlement thereto).

We also are aware that this issue has surfaced in at least two cases from the United States Court of Appeals for the Second Circuit. In *Gagne* v. *Enfield*, 734 F.2d 902 (2d Cir. 1984), the plaintiff brought a 42 U.S.C. § 1983 claim and a state law negligence claim in the United States District Court for the District of Connecticut. The District Court instructed the jury that if it found the defendants liable for punitive damages, "the judge . . . will award the plaintiff an amount equal to his reasonable costs in bringing this lawsuit." Id., 904. During the trial, however, the plaintiff had "offered no evidence of the cost of litigating his claims." Id., 903. The defendants objected to the court's submission of the issue of punitive damages to the jury. Id. In its verdict, the jury found that punitive damages should be awarded but, in accordance with the judge's instruction, did not specify an amount. Id., 904. The District Court, thereafter, held a posttrial hearing, and it awarded the plaintiff $21,336.40 in punitive damages on his state law negligence claim. Id. On appeal to the Second Circuit, that court reversed the judgment as to the award of punitive damages, and it remanded the case with direction to vacate the punitive damages award. Id., 905. Specifically, the Second Circuit held that, because the plaintiff failed to offer any evidence of his litigation costs *at trial* before the jury, he was not entitled to punitive damages under Connecticut law, and there was "an insufficient evidentiary basis to submit the question of punitive damages to the jury." Id., 905. The Second Circuit also held that "[u]nder the Seventh Amendment, the determination of the amount of such damages is a legal claim and for the jury . . . ." Id.

Then, in *Wolf* v. *Yamin*, 295 F.3d 303, 312 (2d Cir. 2002), the Second Circuit was faced with a similar question regarding whether the amount of common-law punitive damages is a jury question when the defendant so demands, and it certified the following question to our Supreme Court: "[U]nder Connecticut law on punitive damages, is a plaintiff who does not offer any evidence of litigation costs *at trial* before a jury barred from recovering any punitive damages? (This question assumes there has been no agreement by the parties to a bifurcation of the punitive damages determination between the jury/trier of fact as to liability and the judge as to amount)." (Emphasis in original.) As in the present case, the plaintiff in *Wolf* also argued that if the District Court had acted improperly in reserving the question of the amount of damages for a later hearing before

the court, then the Second Circuit should remand the matter "for the sole purpose of a [p]unitive damages hearing before a jury." (Internal quotation marks omitted.) Id., 307.

In *Wolf*, the Second Circuit discussed *Gagne* at length, calling into question its continued viability in light of more recent Connecticut case law. Id., 308–311.[13] The Second Circuit, in *Wolf*, opined that the rule in Connecticut had been clear that, unless agreed otherwise by the parties, evidence as to the amount of punitive damages must be offered *during trial* to warrant such a claim going to the jury. Id., 309. The court relied, in part, on *Venturi* v. *Savitt, Inc.*, 191 Conn. 588, 593, 468 A.2d 933 (1983) (plaintiff failed to prove claim for punitive damages, due in part to failure to offer any evidence of expenses of litigation at trial), and *Chykirda* v. *Yanush*, 131 Conn. 565, 567–69, 41 A.2d 449 (1945) (plaintiff cannot recover punitive damages without evidence of those amounts being presented at trial, "except for those items of taxable costs of which the trial court can take judicial notice"), to support that opinion. *Wolf* v. *Yamin*, supra, 295 F.3d 308–309.

In its determination that our law no longer was clear, the Second Circuit relied on two more recent cases, namely, *Kenny* v. *Civil Service Commission*, 197 Conn. 270, 496 A.2d 956 (1985), and *Berry* v. *Loiseau*, supra, 223 Conn. 786. The Second Circuit explained those cases as follows: "*Kenny* was an action for wrongful termination of employment in which [the] plaintiff sought compensatory and exemplary damages. After a bench trial, the trial court found [the] defendant liable for, among other things, exemplary damages in the amount of [the] plaintiff's litigation expenses. . . . At trial, the court did not take any evidence as to the actual costs of the litigation, and no post-trial damages hearing was held. . . . On appeal, defendant argued in part that since the plaintiff offered no evidence of the cost of litigation at trial, exemplary damages were not recoverable. . . . The Connecticut Supreme Court held: While it concededly is true that [n]o award for an attorney's fee may be made when the evidence is insufficient . . . it is equally clear that liability for attorney's fees can be placed in the absence of any evidence of the cost of the work performed. In this case the trial court found the defendants liable for exemplary damages based on sufficient evidence of discrimination. It merely failed to set the amount of the award. The proper remedy under these circumstances, and the one which we order, is that the case be remanded to the trial court for a hearing to determine the amount of exemplary damages awarded. . . .

"Seven years later, the Connecticut Supreme Court decided *Berry*. In that case, the plaintiff sued his former employer and others, alleging wrongful termination of his employment and other causes of action, and defen-

dants counterclaimed on various theories. The trial court submitted interrogatories to the jury, asking whether punitive damages were warranted on either the plaintiff's claim or the defendants' counterclaim. . . . The court made clear to the jury that if [it] found that punitive damages were warranted, the court would determine the amount thereof. No exception was taken to the charge. The jury responded in the affirmative on both claims for punitive damages. . . . After a hearing before the judge, at which the parties submitted evidence of their litigation expenses, the trial court awarded punitive damages awards to both the plaintiff ($16,667) and the defendants ($50,000). . . .

"Both parties appealed. [The] [p]laintiff challenged the restrictive Connecticut rule limiting punitive damages to the costs of litigation. [The] [p]laintiff also argued [in part] that the trial court . . . improperly denied him his right under the Connecticut constitution to have the jury determine the amount of his punitive damages, [and] . . . improperly applied a Connecticut contingency fee limitation statute to limit his punitive damages . . . . Defendants, on their appeal, claimed, among other things, the trial judge improperly awarded the plaintiff punitive damages when there was no evidence at trial to support such an award. . . .

"On the plaintiff's appeal, the Connecticut Supreme Court rejected the general attack on Connecticut's restrictive punitive damages rule. . . . Next, the Court held that it would not consider the claim that [the] plaintiff had been denied his constitutional right to have a jury determine the amount of his punitive damages award, due to his failure to take a timely exception when the jury instructions on punitive damages were given. . . . Regarding [the] plaintiff's argument that the trial court improperly limited the plaintiff's punitive damages based on the Connecticut contingency fee limitation statute, the Court concluded that the trial court had improperly applied the statute, and reversed and remanded for a new hearing before the judge on punitive damages. . . .

"On the defendants' appeal, the Connecticut Supreme Court rejected the argument that there was no evidence to support [the] plaintiff's punitive damages award. The Court stated evidence of wanton behavior on the part of [the] defendants justified an allowance of punitive damages . . . and that [i]n the present case, the jury could reasonably have found from the evidence presented at the trial that [the defendant] subjected the plaintiff to physical abuse, in reckless disregard of the consequences of his actions. Accordingly, we are persuaded that the trial court properly allowed the jury to decide whether the plaintiff was entitled to punitive damages. . . .

"In this discussion, the Court did not mention whether [the] plaintiff had presented evidence of litiga-

tion costs during the jury trial.

"In *Berry*, two judges concurred in an opinion of the court, two judges concurred in the result only and one judge concurred in a separate opinion, stating that he would not address the issue . . . in the majority opinion concerning the rule limiting punitive damages to the party's litigation costs. . . .

"It is unclear whether the holdings in *Kenny* and *Berry* conflict with earlier Connecticut cases on punitive damages. It is true that *Kenny* was a bench trial with no jury, so that the post-trial hearing allowed the same trier of fact to determine punitive damages, while the case now before us was before a jury, so that the judge was not the trier of fact. Still, the Connecticut Supreme Court in *Kenny* suggested that a post-trial procedure be used by the trial court to determine the amount of punitive damages, rather than holding that the failure to present evidence of litigation costs at trial barred punitive damages.

"The Connecticut Supreme Court's decision in *Berry* provides further evidence of ambiguity in Connecticut law on punitive damages, especially in light of the various concurrences in that case. In *Berry*, the Court again ordered a post-trial hearing (apparently by the court) to determine punitive damages, this time after a jury trial. *Berry* therefore also suggests that Connecticut law does not require a plaintiff to offer evidence of litigation costs at trial. We believe that these two cases, *Kenny* and *Berry*, appear to make Connecticut law on punitive damages ambiguous." (Citations omitted; emphasis omitted; footnotes omitted; internal quotation marks omitted). *Wolf* v. *Yamin*, supra, 295 F.3d 309–11. Two months after the Second Circuit certified its question to our Supreme Court, the request for certification was withdrawn, leaving the question unanswered, and the matter was voluntarily dismissed at the Second Circuit.

We next consider the Second Circuit's statement that *Kenny* and *Berry* "appear to make Connecticut law on punitive damages ambiguous." Id., 311. As noted by the Second Circuit, *Kenny* was a trial to the court, and the remand from our Supreme Court was to the trial court for a hearing in damages. See *Kenny* v. *Civil Service Commission*, supra, 197 Conn. 278–79. That, in and of itself, distinguishes *Kenny* from the cases in which the matter is tried to a jury, and the jury is released from its service after issuing its verdict. We also are unable to discern from the decision, which stated in part, "the court took no evidence as to the actual costs of the ligation, and no posttrial hearing in damages was ever held," whether the trial court made the decision before or during trial that it did not want to take evidence as to the costs of litigation until after it rendered judgment. See id., 278.

In *Berry*, our Supreme Court was called upon to determine, inter alia, whether there was evidence to support an award of punitive damages. *Berry* v. *Loiseau*, supra, 223 Conn. 811. The court held that "the jury could reasonably have found from the evidence presented at the trial that [the defendant] subjected the plaintiff to physical abuse, in reckless disregard of the consequences of his actions. Accordingly, [it was] persuaded that the trial court properly allowed the jury to decide whether the plaintiff was entitled to punitive damages on the sixth count of the complaint." Id., 811–12.

In the plaintiff's separate appeal in *Berry*, he claimed that the trial court, in relevant part, improperly had "(1) denied him his constitutional right to have the jury determine the amount of his punitive damages award; [and] (2) applied General Statutes § 52–251c to limit the amount of punitive damages awarded him to one third of his recovery on the intentional infliction of emotional distress count . . . ." Id., 822–23. Our Supreme Court concluded that the plaintiff had waived his constitutional claim by failing to preserve it; id., 827–28; but it agreed with the plaintiff's second claim, reversed the judgment as to the amount of punitive damages, and remanded the case for a new hearing on punitive damages. Id., 829. The fact that our Supreme Court remanded the case for a hearing on punitive damages, presumably before the trial court, does not indicate to us anything more than that the plaintiff had waived any purported right to have that issue decided by a jury. In the present case, the defendant clearly did not waive any rights she may have had to have the jury decide the amount of punitive damages. Accordingly, we conclude that both *Kenny* and *Berry* are distinguishable from the present case and do not address the resolution of claims for common-law punitive damages submitted to a jury.

In Connecticut, common-law punitive damages, also called exemplary damages, primarily are compensatory in nature. See *Bodner* v. *United Services Auto. Assn.*, 222 Conn. 480, 492, 610 A.2d 1212 (1992) (in Connecticut, common-law punitive damages "are limited to the plaintiff's attorney's fees and nontaxable costs, and thus serve a function that is both compensatory and punitive"); see also *Hylton* v. *Gunter*, supra, 313 Conn. 493 (*McDonald*, *J.*, dissenting) (common-law punitive damages are compensatory in nature, but also serve "a punitive and deterrent function"). "To furnish a basis for recovery of punitive damages, the pleadings must allege and the evidence must show wanton or wilful malicious misconduct, and the language contained in the pleadings must be sufficiently explicit to inform the court and opposing counsel that such damages are being sought. . . . *If awarded, [common-law] punitive damages are limited to the costs of litigation less taxable*

*costs, but, within that limitation, the extent to which they are awarded is in the sole discretion of the trier.* . . . Limiting punitive damages to litigation expenses, including attorney's fees, fulfills the salutary purpose of fully compensating a victim for the harm inflicted . . . while avoiding the potential for injustice which may result from the exercise of unfettered discretion by a jury. . . . We have long held that in a claim for damages, proof of the expenses paid or incurred affords some evidence of the value of the services . . . . *Label Systems Corp.* v. *Aghamohammadi*, 270 Conn. 291, 335–36, 852 A.2d 703 (2004); but cf. *Berry* v. *Loiseau*, supra, 223 Conn. 827 (common-law punitive damages, when viewed in the light of the increasing costs of litigation, also [serve] to punish and deter wrongful conduct)." (Emphasis added; internal quotation marks omitted.) *Hylton* v. *Gunter*, supra, 313 Conn. 486 n.14.

Juries in Connecticut have been awarding punitive damages for "wanton or malicious injuries" for more than two hundred years. See, e.g., *Linsley* v. *Bushnell*, 15 Conn. 225, 235 (1842), and cases cited therein. More recently, in *Bifolck* v. *Philip Morris, Inc.*, 324 Conn. 402, 451, 152 A.3d 1183 (2016), our Supreme Court confirmed that, in a jury trial, the question of the amount of punitive damages is for the jury, not the court, when the parties do not agree to have the court decide that issue. As our Supreme Court explained: "Indeed, it was precisely because juries assessed the amount of punitive damages that this court was motivated to adopt the common-law rule, limiting the exercise of the jury's discretion by tying such damages to litigation expenses."[14] Id. In reaching this conclusion, the court distinguished common-law punitive damages from the award of punitive damages or attorney's fees under certain statutory causes of action that specifically provide that the court, not the jury, is to determine the amount to be awarded. Id., 449–51.[15]

That juries are to determine the amount of common-law punitive damages is confirmed also by our state statutes. General Statutes § 52-215 provides in relevant part: "The following-named classes of cases shall be entered in the docket as jury cases upon the written request of either party made to the clerk within thirty days after the return day . . . civil actions involving such an issue of fact as, prior to January 1, 1880, would not present a question properly cognizable in equity . . . . All issues of fact in any such case shall be tried by the jury, provided the issues agreed by the parties to be tried by the court may be so tried. . . ." See also Practice Book § 14-10.

Additionally, pursuant to General Statutes § 52-216: "The court shall decide all issues of law and all questions of law arising in the trial of any issue of fact; and, in committing the action to the jury, shall direct them to find accordingly. The court shall submit all questions

of fact to the jury, with such observations on the evidence, for their information, as it thinks proper, without any direction as to how they shall find the facts. After the action has been committed to the jury, no pleas, arguments or evidence may be received before the verdict is returned into court and recorded." See also Practice Book § 16-9.

As noted, claims for common-law punitive damages were recognized and submitted to juries for the determination as to the amount of such damages long before 1880. In the present case, the defendant repeatedly told the court and the plaintiff that she wanted the jury to determine the amount of punitive damages. The plaintiff was on notice of this before she put on any evidence in the case, when, on February 6, 2017, the defendant filed her preliminary request to charge the jury and her proposed jury interrogatories. The plaintiff called the first witness on February 8, 2017. There is no indication that the plaintiff filed a motion requesting the court to opine on whether she needed to produce evidence in her case-in-chief as to the amount of her punitive damages. When the defendant again raised this issue during the March 9, 2017 charging conference, which occurred after the close of evidence, the plaintiff did not request to open the evidence to allow her to submit evidence on the amount of punitive damages. The defendant again objected, in the form of an exception, after the court charged the jury on the issue of punitive damages when there had been no evidence as to the amount of those damages. The issue certainly was well preserved.

Because the defendant properly and timely requested that the question of the amount of punitive damages be decided by the jury, it was incumbent on the plaintiff to submit evidence supporting her claim to such damages in her case. It is undisputed that she did not do so. We conclude, on the basis of the foregoing, that the court improperly charged the jury on punitive damages when there was no evidence of damages to support that charge. See *Venturi* v. *Savitt, Inc.*, supra, 191 Conn. 592–93 ("it is essential for the plaintiff to offer evidence of what those [punitive] damages are"; "punitive damages are not properly recoverable in the absence of evidence as to the elements entering into their determination"); *Chykirda* v. *Yanush*, supra, 131 Conn. 568–69 ("[p]unitive damages are limited to the costs of litigation less taxable costs, but within that limitation the extent to which they are awarded is in the discretion of the trier"; "punitive damages are not properly recoverable in the absence of evidence as to the elements entering into a determination of them"); see also *Green* v. *H.N.S. Management Co.*, supra, 91 Conn. App. 758 ("[t]he trial court has a duty not to submit any issue to the jury upon which the evidence would not support a finding" [internal quotation marks omitted]). Accordingly, the judgment as to the defendant's liability for punitive damages must be reversed. The defendant had the right

to have the issue of the amount of punitive damages determined by the jury. In light of the fact that the plaintiff admittedly submitted no evidence of her litigation expenses, the matter should not have gone to the jury.[16]

## IV

The defendant's final claim is that the trial court improperly denied her motion to set aside the verdict, which alleged that there was insufficient evidence that the plaintiff suffers from post-traumatic stress disorder and other psychological trauma and injuries. She argues that the "plaintiff offered no competent and sufficient evidence to establish that she actually suffered from the medical and/or psychological conditions she claimed, or that those conditions were caused by childhood sexual abuse."

The following additional facts and procedural history assist with our review. In her complaint, the plaintiff claimed in count one that the decedent had committed intentional sexual assault against her. She claimed, inter alia, that "[a]s a result of said sexual abuse, sexual assault and sexual exploitation, the plaintiff has suffered extreme trauma, mental anguish and psychological injury, which is permanent in nature." Following the plaintiff's case-in-chief, the defendant filed a motion for a directed verdict on the ground that "the plaintiff ha[d] failed to present any competent and sufficient evidence to establish that she in fact suffers from any of the various medical/psychological conditions that she claims in the harm that was inflicted on her as a result of childhood sexual abuse by [the decedent], or that any such harm was caused by the alleged childhood sexual abuse." The court reserved judgment on that motion.

At the conclusion of the trial, the jury found in favor of the plaintiff on the first count of her complaint, and it returned a damages award of $15 million, as follows: Mental anguish and emotional distress $5 million; psychological trauma and injuries $5 million; permanency of injuries $3 million; and inability to pursue life's enjoyment $2 million. The defendant thereafter filed a motion to set aside the verdict and for a judgment notwithstanding the verdict. In a corrected memorandum of decision, the trial court denied that motion. The defendant claims that this was error. Additional facts will be set forth as necessary.

"Our standard of review of the court's refusal to grant [motions for directed verdicts and to set aside verdicts] requires us to consider the evidence in the light most favorable to the prevailing party, according particular weight to the congruence of the judgment of the trial judge and the jury, who saw the witnesses and heard their testimony. . . . The verdict will be set aside and judgment directed only if we find that the jury could

not reasonably and legally have reached [its] conclusion. . . . While it is the jury's right to draw logical deductions and make reasonable inferences from the facts proven . . . it may not resort to mere conjecture and speculation. . . . If the evidence would not reasonably support a finding of the particular issue, the trial court has a duty not to submit it to the jury. . . . Our standard of review, where the trial court's action on a motion to set aside a verdict is challenged, is whether the trial court clearly abused its discretion. . . . The decision to set aside a verdict is a matter within the broad legal discretion of the trial court and it will not be disturbed unless there has been a clear abuse of that discretion." (Internal quotation marks omitted.) *Kosiorek* v. *Smigelski*, 138 Conn. App. 695, 707–708, 54 A.3d 564 (2012), cert. denied, 308 Conn. 901, 60 A.3d 287 (2013).

The defendant contends that the plaintiff offered no competent medical or psychological evidence to support her claims that she suffers from psychological injuries or that those injuries will continue in the future. She argues that the plaintiff's expert witness, Dawn Hughes, a clinical and forensic psychologist, opined that childhood sexual abuse can result in harmful effects, but she did not draw any conclusions with respect to the plaintiff or her alleged injuries. Furthermore, the defendant argues, no medical professionals with whom the plaintiff previously may have treated testified that she ever suffered from emotional or psychological trauma, or that she will continue in the future to suffer from such trauma. Accordingly, the defendant argues that the court erred in denying her motion to set aside the verdict. The plaintiff argues that the court properly denied the defendant's motion because there was ample evidence of the plaintiff's injuries. We agree with the plaintiff.

The plaintiff testified during trial about her emotional and psychological trauma. She testified that the decedent began abusing her sexually when she was approximately six years old but that she did not understand that this was sexual abuse, and, in fact, she "thought he was maybe cuddling [her] but it also hurts." She testified about the hair on his arms, his breath, his saliva on her neck, and his smell. She testified that this abuse happened on a regular basis until she was seventeen years old and that she tried to distract herself while it was occurring, attempting to focus on other things.

The plaintiff also testified that at age nine, she was "very popular," that she "felt like [she] was the teacher's pet . . . [and that] all the girls wanted to be [her] friend. [She] was doing . . . really well, amazingly well academically . . . [that she] was put into the highest math class . . . [and that she] felt . . . very confident and okay." The plaintiff said, however, that this all changed as she began to reach puberty, around the age

of ten, and that the abuse became more intense after that. She stated that at that time she came to realize that what the decedent was doing was sexual. She testified that she "became absolutely consumed with shame and . . . felt so dirty. [She] felt really guilty because [she] felt like [she] was doing something bad to [her] mom. [She] couldn't sleep because [she] was afraid [the decedent] would come in, and [she] started withdrawing." She also testified that she stopped doing well in school, stopped socializing with friends, and experienced binge eating, and that she wanted to die. She also stated that she wanted to gain weight so that she would be unattractive to the decedent.

The plaintiff testified that by the time she was in high school, she "considered [her]self to be fat and [she] felt ugly and unattractive . . . ." She also stated that she had low self-esteem and that, in her junior year of high school, she received several grades of "D."

The plaintiff told the jury about her prior drug abuse, her alcohol abuse, and her sexual promiscuity, and she stated that she did things because she "was trying to just not be here, just go someplace away from reality because [she] had felt so much shame about [her]self." She testified about her experiences with psychotherapy, cognitive behavioral therapy, and an incest group that was made up of women who had been victims of childhood sexual abuse. She testified about dealing with "the trauma and the flashbacks, the intrusive memories, the panic, the anxiety, [and] the sadness . . . ." She detailed how those issues still continue and discussed her depression, insomnia, sadness, and belief that nearly every decision she makes in her life is shaped by the abuse she suffered. She testified about her difficulty being around aggressive, strong, or professional men, who remind her of the decedent, and how she can't function in their presence. The plaintiff also testified about her husband and some of the marital issues they have experienced related to sexual intimacy. She explained that although she has been in therapy for years, she still feels dirty and ashamed, but that she tries to take one day at a time by concentrating on being healthy that day. Some of the plaintiff's other witnesses also substantiated portions of the plaintiff's testimony.[17]

The plaintiff also called Dr. Hughes to testify as an expert. Hughes testified that she specializes in "interpersonal violence and traumatic stress . . . [which] covers childhood abuse, childhood sexual abuse, rape, sexual assault, domestic violence . . . and single assaults." She explained that children who experience sexual abuse often do not report the abuse and that they may be afraid. She also stated that the children may be unaware of what is happening to them and that they may feel dirty and a tremendous amount of shame and embarrassment.

Hughes testified that "when we look at the effects of childhood sexual abuse, we see that there's a higher degree of likelihood of a number of disorders and difficulties. So, we see post-traumatic stress disorder. We see depressive disorders; we see anxiety disorders. We see suicidality. We see sleep difficulties. We also see a host of . . . problems in living, interpersonal difficulties, difficulties trusting others, still struggling immensely with guilt, and shame, and embarrassment, even years later."

Hughes also stated: "So, when an individual who has been sexually abused as a child . . . they learn the wrong things. Basically, they learn that someone who loves you and is supposed to take care of you, also can harm you and abuse you. . . . So, when [these children] go out into the world, they often have trust difficulties . . . . They don't really know if they can trust people. They often have difficulties with people in authority because people who were above them . . . abused that power and sexually abused them. They often have difficulty with their . . . own sense of value. Having been abused makes one feel . . . dirty and damaged . . . and ashamed. . . . [A] lot of abuse victims . . . find themselves closed in and not offering much of themselves. As a result, then they tend to feel very disconnected in this world . . . ."

Hughes discussed that victims of childhood sexual abuse often have problems having healthy sexual relationships because of the nature of their trauma. She explained that post-traumatic stress disorder (PTSD) "is a disorder that arises when somebody has been exposed to a traumatic stressor. . . . [T]he brain remembers. So, the memories continue. Sometimes, we say, the trauma ends and the nightmare begins. . . . [W]hen the memories of the abuse come into their mind, they're psychologically distressed. So then they have accompanying symptoms of sadness, of guilt, of anger, of rage, of embarrassment, that continue to linger. Sometimes they have dreams about abusive episodes or themes of abuses as well. The next thing they try to do . . . is avoid. That's a second symptom . . . of PTSD, the intrusion, then the avoidance. They try to push . . . it away. They try not to think about it. We try not to feel it. Those are the avoidance clusters."

Hughes then talked about the "hyperarousal" response that PTSD sufferers also may experience. She stated that they often are "quite jumpy." They experience a "sense of hypervigilance . . . scanning the environment to make sure you're safe." She stated that this "disrupts concentration and attention, our ability to . . . sleep . . . ." Hughes then explained: "And then the . . . fourth cluster of symptoms is . . . changes in your thoughts and feelings. It changes the way you view the world. . . . [T]he world is not safe . . . . Also, I am not worthy. You know, I am disgusting. These

sort of . . . fundamental changes in the way someone views the world.''

Hughes also opined that ''depressive disorders have been associated with individuals who have been abused as children. It actually is one of the most robust findings, the depressive disorders, even sometimes above and beyond PTSD . . . . People can have depression that doesn't rise to a level of a disorder, but once it gets to a disorder, the definition includes impairment and functioning. . . . So depression certainly . . . is related—has been shown to be related to childhood sexual abuse and can also interfere with people's everyday functioning.''

The defendant contends that this evidence was insufficient to support the plaintiff's claim for psychological damages. She argues that the plaintiff needed competent medical or psychological evidence to support her claims that she suffers from psychological injuries or that those injuries will continue in the future. We conclude that the evidence was sufficient.

In *Braun* v. *Edelstein*, 17 Conn. App. 658, 661–62, 554 A.2d 1102, cert. denied, 211 Conn. 803, 599 A.2d 1136 (1989), this court considered and rejected a claim that is similar to the one raised by the defendant. In that case, the defendant, Edelstein, had argued that the plaintiff needed to call her treating psychiatrist to testify that the assault by the defendant had caused the plaintiff's emotional injury. Id. Specifically, this court explained: ''[E]xpert testimony is not required in order to prevail on a claim for mental suffering. A plaintiff may recover damages in a personal injury action for pain and suffering even when such pain and suffering is evidenced exclusively by the plaintiff's subjective complaints. . . . A plaintiff need only establish a claim for mental or emotional distress by a fair preponderance of the evidence. . . . The defendant does not demonstrate that the plaintiff failed to meet this burden. Our function is to decide whether the decision of the trial court was clearly erroneous in view of the evidence and pleadings in the whole record . . . . Weighing the evidence and judging the credibility of the witnesses is the function of the trier of fact and this court will not usurp that role.'' (Citations omitted; internal quotation marks omitted.) Id., 662; see *Giordano* v. *Giordano*, 39 Conn. App. 183, 184–85, 207–208, 664 A.2d 1136 (1995) (in action alleging six counts of sexual abuse and emotional distress against grandfather, court found testimony of grandchildren sufficient to support award of prejudgment remedy, holding ''[p]laintiffs claiming damages as a result of emotional distress are not required to present expert medical testimony . . . to substantiate their claims of noneconomic damages such as pain and suffering'' [emphasis omitted]).

In the present case, the plaintiff submitted factual evidence as to what the decedent did to her and the

impact his actions have had on her emotional and psychological well-being. She also submitted expert testimony, through Hughes, regarding the symptoms typically displayed by victims of sexual abuse and sexual assault. It was in the province of the jury to conclude, on the basis of all of the evidence it heard, that the plaintiff's evidence regarding the emotional and psychological injuries inflicted on her at the hands of the decedent was credible and that her injuries were worthy of compensation. We conclude, therefore, on the basis of the evidence presented, that there was ample proof to support the jury's verdict and, therefore, that the court did not abuse its discretion when it denied the defendant's motion to set aside that verdict.

In conclusion, the court properly denied the plaintiff's motion to dismiss, concluding that it had personal jurisdiction over the estate; the defendant failed to prove that she was harmed by any purported impropriety in the court's admission of certain evidence; the court improperly sent to the jury the question of the plaintiff's entitlement to punitive damages when the plaintiff had failed to submit evidence at trial of her litigation expenses; and the court did not abuse its discretion in denying the defendant's motion to set aside the verdict because there was ample evidence that the plaintiff suffers from psychological trauma caused by the childhood sexual abuse of the decedent.

The judgment is reversed only as to the defendant's liability for punitive damages and the case is remanded with direction to vacate the jury's finding in that regard; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] The jury was instructed not to return a verdict on the second count of the plaintiff's complaint if it returned a verdict in her favor on the first count.

[2] General Statutes § 52-59b (a) provides: "As to a cause of action arising from any of the acts enumerated in this section, *a court may exercise personal jurisdiction over any nonresident individual*, foreign partnership or foreign voluntary association, *or over the executor or administrator of such nonresident individual*, foreign partnership or foreign voluntary association, *who in person or through an agent*: (1) Transacts any business within the state; (2) *commits a tortious act within the state*, except as to a cause of action for defamation of character arising from the act; (3) commits a tortious act outside the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if such person or agent (A) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (B) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; (4) owns, uses or possesses any real property situated within the state; or (5) uses a computer, as defined in subdivision (1) of subsection (a) of section 53-451, or a computer network, as defined in subdivision (3) of subsection (a) of said section, located within the state." (Emphasis added.)

[3] "Hearsay [refers to] a statement, other than the one made by the declarant while testifying at the proceeding, offered in evidence to establish the truth of the matter asserted. Conn. Code Evid. § 8-1 (3). Hearsay is inadmissible, except as provided in the Code, the General Statutes or the Practice Book. Conn. Code Evid. § 8-2." (Internal quotation marks omitted.) *Miron* v. *University of New Haven Police Dept.*, 284 Conn. 35, 50–51, 931 A.2d 847 (2007).

[4] Section 4-5 of the Connecticut Code of Evidence provides in relevant

part: "(a) General Rule. Evidence of other crimes, wrongs or acts of a person is inadmissible to prove the bad character, propensity, or criminal tendencies of that person except as provided in subsection (b).

"(b) When Evidence of other sexual misconduct is admissible to prove propensity. Evidence of other sexual misconduct is admissible in a criminal case to establish . . . .

"(c) When evidence of other crimes, wrongs or acts is admissible. Evidence of other crimes, wrongs or acts of a person is admissible for purposes other than those specified in subsection (a), such as to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony.

"(d) Specific instances of conduct when character in issue. In cases in which character or a trait of character of a person in relation to a charge, claim or defense is in issue, proof shall be made by evidence of specific instances of the person's conduct."

[5] We understand the court's reference to pending objections to be to what are more commonly referred to as "standing objections" or "continuing objections," meaning "[a] single objection to all the questions in a given line of questioning"; Black's Law Dictionary (7th Ed. 1999), p. 1011; rather than objections interposed on a question by question basis. See id.

[6] The defendant also argues that insofar as the court refused "to acknowledge a 'pending objection,' " this was error, in violation of Practice Book § 60-5, which provides in relevant part: "In jury trials, where there is a motion, argument, or offer of proof or evidence in the absence of the jury, whether during trial or before, pertaining to an issue that later arises in the presence of the jury, and counsel has fully complied with the requirements for preserving any objection or exception to the judge's adverse ruling thereon in the absence of the jury, the matter shall be deemed to be distinctly raised at the trial for purposes of this rule without a further objection or exception provided that the grounds for such objection or exception, and the ruling thereon as previously articulated, remain the same. . . ."

We disagree with the defendant's contention. The portion of Practice Book § 60-5 on which the defendant relies specifically states that an objection is preserved if "counsel has fully complied with the requirements for preserving any objection . . . to the judge's adverse ruling . . . ." In this case, the court's denial of the defendant's motion in limine was not a definitive adverse ruling. Instead, the court specifically required counsel to voice an objection at the appropriate times during trial because the court believed that some of the evidence on the issue of the decedent's physical, verbal, and emotional abuse could be admissible. Accordingly, in order to preserve an objection, the defendant was required to object and give the court the opportunity to rule on the objection.

[7] The defendant cites only a small portion of this testimony; the complete testimony was as follows: "There was . . . one instance where [the decedent]—I must have been fourteen or fifteen—came in naked into [the plaintiff's] room. She and I—in Connecticut. We were talking and playing on her bed. She immediately rolled off the bed and tried to hide underneath the bed. And I was really concerned about [her], but also really worried about what was going on, and I stood up to [the decedent] in front of him. I said, why are you—why are you in [the plaintiff's] room without any clothes on? She's obviously scared. And as he's done many times, he hit me and—in the stomach. And I remember doubling over. He grabbed my hair and threw me on the floor and he said, never question me.

"That is a memory that I have but it's not the only one. We were—when we would come back from Connecticut, where we lived significant amounts of our time in our house there, when we were talking too loud in the car coming back home on the highway, it didn't even matter who was doing the loud talking. Even when he was driving in the car, he'd turn around and start to hit us. [The plaintiff] was in the car. She was just a little girl.

"Another road rage incident, my parents both smoked cigarettes, and it was really difficult for me, even as a teenager, to sit in the car with cigarette smoke. And I remember telling [the decedent] to please put their cigarettes out because the smoke was really bothering me, and his response was to roll up the windows and say, you're just going to have to live with it.

"I started yelling, stop; I don't want to sit in a car with all of this smoke, it's hard to breathe. And I remember him veering over on the highway from the left lane because he always drove really quickly, veering over on the highway, screeching this car to a stop, getting out of the car and insisting that I get out. And I knew what was coming, but I didn't want to. And he

started screaming, get out of the car, get out of the car now, and I didn't want to. And the kids, my brothers and sister were crying. And he kept on screaming get out of the car. And I knew that if I didn't get out of the car that we all would probably suffer, so I got out of the car, and he just wacked me with the back of his hand. I was thirteen or fourteen.

"The night before I went to college, we were in Connecticut. I was proud because I was about to become a young man leaving home. [The decedent] started drinking. There was yelling going on. There was constantly yelling in the house. He saw that Michael also—my younger brother—took a drink because he was upset, and I observed [the decedent] grab my brother, and [the plaintiff] was right there in the room right next door. He pulled him up the stairs literally by his shirt, almost trying to drag him up the stairs, shoved him into our second floor bathtub in Connecticut, literally just— and I was watching because I was trying to stop him put his head into the bathtub, turn on cold water, and then started hitting him like this. [The plaintiff] was screaming. She came in. He pushed me away. This was my moment before I was going to college. They drove me and dropped me at the train station with all of my bags, and I went up to college alone the next day."

[8] The defendant also makes a passing claim that the court's limiting instruction was insufficient. She argues: "The highly inflammatory nature of the evidence and repetition by several witnesses could not logically be separated from the claims of sexual abuse as the trial judge instructed. Additionally the trial court instructed the jury that it could properly consider 'what effect, if any, such conduct had on the plaintiff,' thereby ultimately undercutting its own limiting instruction." We are not persuaded by the defendant's argument, especially in light of the fact that her own supplemental and amended proposed jury instructions contained the exact phrase that she now contends was improper.

[9] Section 8-3 (4) of the Connecticut Code of Evidence, setting forth the state of mind exception to the hearsay rule, provides: "A statement of the declarant's then existing mental or emotional condition, including a statement indicating a present intention to do a particular act in the immediate future, provided that the statement is a natural expression of the condition and is not a statement of memory or belief to prove the fact remembered or believed."

[10] The defendant cites only a portion of this excerpt, the entirety of which is as follows: "I am really looking forward to seeing the [Fifth] Element this afternoon at 5 p.m. All day I have been thinking about the sickening stuff that [the decedent] does. It is so disturbing. It is so hard for me to stay present. I'm in this great city for God's sake."

[11] On appeal, the defendant cites to only a portion of this excerpt. The entirety of the excerpt to which she objected during trial is as follows: "Dear Dad, after much thought, in fact [seven] years of thought, I have concluded that no emotions, act or word is in reality a black or white entity. For as there are as many angles at looking at a thing, there are also as many perceptions of what is being studied. You are a scientist, and have shown to me that you have the ability to think like a scientist—logically, I'm sure you would agree. Only by looking at *all* angles intensely, thoroughly, can one eventually understand the organism as a whole.

"For many years now I have committed to myself a pursuit to better understand myself, from all angles. After much thought, empirical experience, and thousands upon thousands of pages of research to support my point of view, I believe that the interfamilial relationships play a huge role in the development and perception of the self in all its manifestations. Call them what you will—ego, id, super ego, self efficacy, self esteem. This development is especially touched by the parent-child relationship.

"And so, I have examined our relationship. And I know of times you helped bolster my sense of worth, where you acted as often fathers do with love, selflessness, support and guidance.

"I also have examined times when you acted with immaturity, insolence, greed and violence. You fondled my genitalia! I always pretended to be asleep. I told my friends about these things then, I told my brother about these things when I was [sixteen]. I saw a therapist about it in college, and wrote about it in my journal from ages [eleven] to today. You recall only one incident. So one of us is inaccurate. I swear on my mother's grave and on my nephews lives I know the incest you did actions to be true.

"So, in my pursuit to better understand myself, I wrote in a journal, wrote letters not meant to be sent, which explored all angles of my feelings to better understand myself. I also attended at least [five] incest support groups,

did workbooks, etc.

"It is unfortunate that mom read my papers. I had kept much of my pain from her, did not seek her help to protect her. I felt telling her would cause her too much pain. How much it would hurt her to know that your actions were the source of incredible pain for me.

"I invested much energy and gave up a lot of soothing and endured humiliation and pain for years by not telling mom. This was a choice I made to protect her. Not me, but mom.

"You say mean, hurtful things to me. You say I killed mom. I cannot forget that. I perceive you saying that as perverse and bizarre. Many agree with me. I see you bring up your marriage at Jon's wedding as using really poor judgement. I think you use poor judgement about a lot of things. It is clear to me you have a distorted understanding of reality. I see you screaming and beating up your children as using poor judgement.

"You told me you dislike me. I don't believe you know me well enough to make such conclusions." (Emphasis in original.)

[12] Justice McDonald, joined by Justice Zarella, authored a strong dissent in *Hylton*, opining that *Lord* had been decided correctly by this court. *Hylton* v. *Gunter*, supra, 313 Conn. 489 (*McDonald, J.*, dissenting). Specifically, Justice McDonald stated that *Lord* was correct because "punitive damages, unlike attorney's fees, *are always integral* to the judgment on the merits. Moreover, no . . . case-by-case inquiry would be necessary . . . if this court were to adopt *Lord*, because it effectively adopted a bright line final judgment rule for punitive damages." (Emphasis added.) Id., 489–90.

[13] The court, however, made no mention of a federal constitutional question, but it considered the issue solely as a matter of Connecticut law. See *Wolf* v. *Yamin*, 295 F.3d 308–11. We are unable to determine from the court's decision whether the defendant had raised a constitutional claim or whether the court, unlike the court in *Gagne*, had concluded that this was not a constitutional issue. See id. In any event, in the present case, the defendant has not argued a violation of a constitutional right, either under the federal constitution or the state constitution, and we, therefore, consider any constitutional claim waived. See *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 162 n.33, 84 A.3d 840 (2014) (appellate courts not required to review issues of possible constitutional error if not raised by appellant).

[14] Connecticut Civil Jury Instructions 3.4-4 offers the following jury instruction for cases involving punitive damages: "In addition to seeking compensatory damages, the plaintiff seeks an award of punitive damages. Punitive damages are damages awarded not to compensate the plaintiff for any injury or losses but to punish the defendant for outrageous conduct and to deter (him/her) and others like (him/her) from similar conduct in the future. Punitive damages may be awarded for conduct that is outrageous, because of the defendant's reckless indifference to the rights of others or an intentional and wanton violation of those rights. You may award punitive damages only if you unanimously find, from facts established by a preponderance of the evidence, that the conduct of the defendant was, in fact, outrageous.

"The law does not require you to award punitive damages. It is, instead, a matter for your sound discretion. An award of punitive damages must not reflect bias, prejudice or sympathy with respect to any party. It must instead be fairly based on the evidence in the case.

"There is no exact standard for fixing the amount of punitive damages. The amount awarded, if any, should be the amount you unanimously find necessary for achieving the objectives of punitive damages that I have described. You should consider the degree of reprehensibility of the defendant's misconduct and the actual or potential harm suffered by the plaintiff." Connecticut Civil Jury Instructions 3.4-4, available at https://www.jud.ct.gov/JI/Civil/Civil.pdf (last visited September 5, 2019).

In the notes that follow the model instruction, the following is offered: "With respect to common-law causes of action, the final paragraph of the suggested charge should be replaced by the following language: 'Punitive damages are limited to the costs of litigation, including attorney's fees, less taxable costs. Within that limitation, the extent to which they are awarded is within your sole discretion.' . . . '[T]here is an undisputed requirement that the reasonableness of attorney's fees and costs must be proven by an appropriate evidentiary showing.' . . .

"With respect to common-law causes of action, it may be prudent to have the jury find whether an award of punitive damages is appropriate and to have the court subsequently determine the amount of such award." (Citations omitted.) Id., notes. The final suggestion, however, does not address what

the court should do if the defendant objects to that procedure.

[15] In a footnote, the Supreme Court stated: "We note that, despite repeated statements in the past that 'the extent to which exemplary damages are to be awarded ordinarily rests in the discretion of the trier of the facts'; *Gionfriddo* v. *Avis Rent A Car System, Inc.*, 192 Conn. 280, 295, 472 A.2d 306 (1984); several more recent decisions reflect a trend toward having the trial court determine the amount of common-law punitive damages following a jury trial, thus implicitly limiting this statement to a determination of the entitlement to such damages. See *Harris* v. *Bradley Memorial Hospital & Health Center, Inc.*, 306 Conn. 304, 313, 50 A.3d 841 (2012), cert. denied, 569 U.S. 918, 133 S. Ct. 1809, 185 L. Ed. 2d 812 (2013); *Nelson* v. *Tradewind Aviation, LLC*, 155 Conn. App. 519, 530, 111 A.3d 887, cert. denied, 316 Conn. 918, 113 A.3d 1016 (2015); *R.I. Pools, Inc.* v. *Paramount Concrete, Inc.*, 149 Conn. App. 839, 873–74, 89 A.3d 993, cert. denied, 312 Conn. 920, 94 A.3d 1200 (2014); *Metcoff* v. *NCT Group, Inc.*, 137 Conn. App. 578, 582, 49 A.3d 282 (2012); *Bridgeport Harbour Place I, LLC* v. *Ganim*, 131 Conn. App. 99, 165–66, 30 A.3d 703, cert. granted, 303 Conn. 904, 31 A.3d 1179 (2011) (appeal withdrawn January 27, 2012), cert. granted, 303 Conn. 905, 31 A.3d 1180 (2011) (appeal withdrawn January 26, 2012)." *Bifolck* v. *Philip Morris, Inc.*, supra, 324 Conn. 450 n.24. None of the cases cited by the court in *Bifolck*, however, involved matters in which there had been a jury trial and the defendant had objected to the trial court reserving the issue of *the amount* of the punitive damages to itself; they all appear to be cases in which the parties either agreed that the court, rather than the jury, would determine the amount to be awarded after the jury found the plaintiff liable, or they involved trials to the court.

[16] We also are unpersuaded by the plaintiff's argument that, because the case was not completely over when she rested, it was not possible for her to submit evidence of her litigation expenses to the jury. There are numerous examples of this court and our Supreme Court reviewing common-law punitive damages awards made by juries on the basis of the plaintiff's evidence of litigation expenses. See, e.g., *Matthiessen* v. *Vanech*, 266 Conn. 822, 826, 836 A.2d 394 (2003) (jury awarded $118,000 in common-law punitive damages).

[17] For example, Jonathan Spalter testified that he "observed [the plaintiff] being transformed and when she was a little girl . . . she was . . . the light of our life . . . she had so many friends. She . . . really was this joyful little girl, so smart, so curious. She would come and help me with my own homework. I would bring her in and she just was exuberant. And by the time she turned . . . maybe eight years old . . . I noticed things like she just started becoming a little more withdrawn. . . . I remember . . . coming in late at night into the kitchen and seeing [her] . . . on the floor eating . . . ice cream, the whole half gallon thing of ice cream. She was a little girl. And she started to gain weight. . . . And in the next couple of years . . . this once happy-go-lucky girl, who was so curious about things, had so many friends, just the lights went off. . . . She became withdrawn, and morose, and sad . . . . [W]hen she . . . [was] a junior or senior in high school, this really became a more of her permanent state." Alan Spalter testified to similar changes in the plaintiff's behavior and personality.